132 So.2d 460 (1961)
FINLEY P. SMITH, INC., Appellant,
v.
Mary SCHECTMAN, Appellee.
FINLEY P. SMITH, INC., Appellant,
v.
Seymour SCHECTMAN, Appellee.
Nos. 2205, 2206.
District Court of Appeal of Florida. Second District.
August 30, 1961.
*461 Frank M. Hamilton, Fleming, O'Bryan & Fleming, Fort Lauderdale, for appellant.
Charles Desmond Crowley, Fort Lauderdale, for appellees.
ALLEN, Acting Chief Judge.
These appeals were instituted as two suits at law by Mary Schectman and her husband, Seymour Schectman, for damages for personal injuries received when an automobile, operated by Mrs. Schectman, and owned by her husband who was a passenger therein, went out of control after traveling over a rough spot in the pavement which was under construction by the defendant corporation. The trial resulted in a jury verdict in favor of the plaintiff wife for $2,000 and a verdict for the plaintiff husband of $7,000. The appeals have been consolidated pursuant to stipulations of the parties.
Dunn Construction Company entered into a contract with the State Road Department whereby Dunn, through its subcontractors, was to construct or "four-lane" a portion of U.S. Highway #1, in Martin County. The construction covered a stretch of highway 8.5 miles in length and the accident occurred on a portion of the highway under construction.
The highway was formerly a two-lane highway running north and south. In constructing the additional two lanes it was necessary to install several drainage culverts. Dunn Construction subcontracted with Finley P. Smith, Inc., to perform the portion of highway construction involved in this suit. A culvert had been constructed by pouring concrete into a wooden form which had required a large excavation across the highway. Traffic was detoured until the concrete had cured and the forms *462 were removed. The excavation was filled in and topped with limerock.
The limerock was rolled and traffic was reopened in order to further pack the limerock and fill dirt before concrete was poured.
The plaintiffs were traveling south, Mrs. Schectman was driving and Mr. Schectman was asleep in the back seat of the automobile when it went out of control on the rough stretch of road, thereby injuring the plaintiffs.
Mrs. Schectman testified that she did not see the area where the culvert had been installed; that she does not grip the steering wheel tightly while driving but does hold it lightly; and that when the car hit the depressed rough stretch it went out of control and the next thing she remembers is when she awoke after the accident.
McKeever Simmons, the only eyewitness, testified that Mrs. Schectman passed him at an approximate speed of 30 to 35 miles per hour while he was traveling 25 miles per hour; that the accident occurred when he was 100 to 150 feet behind the plaintiffs' automobile; that plaintiffs' vehicle hit some holes in the road, veered to the left and landed in the ditch. Simmons stated that the culvert fill portion was 15 to 20 feet wide; that there were some holes 9 to 12 inches deep, some of which were 6 inches wide; and that it was difficult to see this portion until you were "right up on it."
It appears from the record that Deputy Johnson testified that there were "pot-holes" in the road caused by the rain and the traffic and that he braced himself when traveling that portion of the highway.
The facts adduced in the trial of these two consolidated cases nearly parallel the facts in the case of Smith Engineering & Construction Co. v. Cohn, Fla. 1957, 94 So.2d 826, 828. In this case the Supreme Court held that where a contract to repair a highway required the contractor to keep the highway open for traffic while work was being done, the contractor was liable for damages sustained when a truck overturned as a result of negligence of the contractor in replacing a portion of a roadbed which, together with pavement, had been removed for installation of temporary culverts.
In the above case the plaintiff observed a sign which read "road under construction," then proceeded about one mile and observed a break in the pavement. He brought his truck to a stop and studied the road and, while it was unpaved for about twelve feet, it appeared safe. He turned to the center of the road and proceeded over the unpaved area. The tractor part of the truck crossed the break without difficulty but the trailer turned over on its side and carried the tractor over on the road. The Court, in its opinion, said:
"The Company was a road contractor and at the time of the accident was under contract with the State Road Department, to repair this particular sector of Highway 20. The contract required that the Company keep the road open for traffic while the work was being done. It appears that the break in the pavement was caused by the installation of temporary culverts to divert water from the permanent culvert which was being extended. The pavement and roadbed had been removed for this purpose but the roadbed was replaced at the time and the road surfaced and packed with tractors and clay placed on the surface. A heavy rain had recently fallen but the driver of the truck testified that the roadbed appeared in good condition so he proceeded across.
* * * * * *
"The complaint was grounded on negligence of appellant, the jury found it negligent which was not controverted, its contract with the State Road Department required it to keep the road in such condition while being repaired as traffic could pass over it. *463 The following cases conclude the point against the contention of appellant: Price v. Parks, 127 Fla. 744, 173 So. 903; Briscoe v. Worley, Okl., 253 P.2d 145; Morgan Hill Paving Co. v. Fonville, 218 Ala. 566, 119 So. 610; Holmes v. T.M. Strider & Co., 186 Miss. 380, 189 So. 518, 123 A.L.R. 1190."
This court affirmed the lower court in M.J. Carroll Contracting Company v. Pine, Fla.App. 1958, 103 So.2d 685, 688, another action brought against a road contractor for alleged negligence in a highway construction job. In the opinion we quoted from a concurring opinion of Mr. Justice Davis in the case of H.E. Wolfe Construction Co. v. Ellison, 1936, 127 Fla. 808, 174 So. 594, 602, where Mr. Justice Davis stated:
"`* * * The general rule to the foregoing effect is thus succinctly stated by the Supreme Court of Alabama [Kearns v. Mobile Light & R. Co., 196 Ala. 99, 71 So. 993, 994] as follows: "It must of course be conceded that, as a general rule, the sufficiency of signals or barriers to give reasonable warning of or security against existing danger, especially with respect to their character, number, and arrangement, is a question of fact for the jury."'"
The defendant was a subcontractor of Dunn Construction Company whose contract with the State Road Department of Florida required that the road under construction be kept in such condition that traffic could pass over it and that there should be a safe passageway at all times for traffic and that all necessary precautions should be taken for the protection of the work and safety of the public.
The issues were submitted to a jury and the jury's determination of the factual situation was in favor of the plaintiffs below, appellees here.
The plaintiff, Mary Schectman, testified under questioning by her counsel, that she had observed the sign "Road Under Construction, Resume Speed of 35 Miles an Hour," a mile or two north of the accident scene; that prior to that she had observed a sign "Speed Limit 10 Miles an Hour" which was previous to the resume-speed sign.
Mrs. Schectman also testified as follows:
"Q. Now, would you tell us what you did immediately preceding the accident, a few minutes preceding the accident? A. I was driving along this smooth road, and then I hit a piece of chopped up road and my hands were thrown off the steering wheel, because when I drive I don't grasp the steering wheel tightly. I hold it enough to maneuver it. I don't hold it this way (indicating,) and as I hit that my hands were thrown off the wheel and then I did grab the wheel tightly and I started braking, and I was thrown against the steering wheel, and that is all I remember until I woke up.
* * * * * *
"Q. How soon was it before you passed over this rough portion of the road that you noticed this rough portion? A. I didn't notice it until I was right on top of it."
On cross-examination Mrs. Schectman testified:
"Q. I think you did not see this cut-through on the road until you were right up on it? A. That is correct.
"Q. Could you tell me how far you were from it from where I am to you? A. Until I was right actually on it.
"Q. Would it be safe to say that you did not see it until you felt the bumps? A. I didn't see it until I was actually upon it.
* * * * * *
"Q. You had been watching the road in front of you as you were approaching it? A. Yes."
McKeever Simmons, the only eye witness, testified that he was traveling about *464 25 miles an hour and the plaintiffs passed him at an average of about 35 miles an hour; that after she passed him and had gotten back on the right side of the road, about 300 or 400 feet away, that she struck the rough portion of the road and he said: "I just see'd it happen. It hit the holes in the road, went down about 600 feet, went across and in the ditch." He said he recalled a speed limit on a sign "Right there at the point of the road where the two constructions met up, where it come to the old road, they had a sign up above there where they had put in one culvert across the road and had a sign up there where it said 35 miles an hour."
Mr. Simmons further testified as follows:
"Q. Now, these holes, about how big were they? A. Well, I couldn't exactly tell you how big they was. I didn't measure them. They were big enough and down to the surface. They would average from 9 to 12 inches deep."
The witness indicated that the holes were more than six inches wide; that the portions of the road that had been replaced were 15 to 20 feet wide which was the portion of the road that had been torn up to put this culvert underneath the road. The witness was further asked:
"Q. Now, how close was it before you saw the rough spot in the road? A. Right up on it.
"Q. Right up on it? A. Yes, sir.
"Q. Why was that? A. Because the blacktop  You couldn't tell until you were right upon it that it didn't have no asphalt or blacktop.
"Q. Now, prior to this rough spot on the road where the accident occurred, had you seen any construction sign? A. No, sir; there was no construction sign where the accident happened.
"Q. Further north was there any construction sign? A. There was one great big sign up north where it said 35 miles an hour.
"Q. Were there any other signs? A. No, sir.
"Q. Now, as you approached this particular rough spot, where the accident occurred, were there any blinkers or warning devices? A. No, sir."
Deputy Sheriff Joe Johnson, who had investigated the accident, testified:
"A. The highway, which is now a four-lane  it was a two-lane and construction was underway building a new lane. The drainage culverts being cut across here, across the old highway for drainage purposes, and they drain off in some canals, I believe. Back in here there was a curve and just preceding that curve there was signs `Highway under Construction, A Sign of Progress, Speed Limit 35 miles an hour,' where these had been cut across the pavement. At this time it had not been repaved, it had rock in it but had not been repaired and filled in.
"It had rained during that night and the section was pretty rough. There was pot holes in it, and by investigation I found a car coming south struck these pot holes, lost control and went into the ditch.
"Say this is the parkway section or earth section across the old highway and across the new part that was being built, and the car came to rest here in the ditch."
The Deputy Sheriff Johnson further stated:
"Q. About what hour did you pass over this road prior to the accident, about how long before the accident occurred? A. Six or seven hours.
"Q. What was the condition of the road when you passed over it? A. The area was rough at the time.
"Q. Why do you recall that? A. I remember when I was going in I hit *465 it and I recall saying to myself, `Boy, these things got pretty rough tonight.'"
The witness further stated that the accident report showed it occurred at dawn or around dawn and the sky was cloudy.
There was conflict in the evidence but the jury resolved such conflicts in favor of the plaintiffs. The trial court denied the defendant's motion for directed verdict and also a motion for new trial. We find no error in the judge's actions in either respect.
The first point submitted by the appellant is as follows:
"Did the trial court commit error prejudicial to the defendant when he instructed the jury, over the objection of the defendant, that the plaintiffs would be entitled to a verdict if the jury found that a dangerous condition existed on the highway, provided that they further found that the plaintiffs were not guilty of contributory negligence; when the duty owed by the defendant to the plaintiffs, as alleged in the pleadings filed by the plaintiffs, and as further defined by the existing law was not based upon the presence or absence on the highway of a dangerous condition, but rather, the failure of the defendant to provide adequate warnings to the plaintiffs of the presence of said condition?"
We observe that the point above involved, as argued by the appellant, was based primarily on its contention that the instruction did not conform to the pleading and that there was nothing in the amended complaint of the plaintiffs which necessitated or justified a charge such as the one complained of. It was further contended that the amended complaint charged inadequate warning of an existing condition which constituted negligence on the part of the defendant.
The latter part of paragraph 4 of the amended complaint states:
"* * * [I]n that said road on which said open ditch, excavation and/or hole had been made by the defendant, was openly and notoriously dangerous, and that defendant had actual notice of its dangerous condition or by the exercise of reasonable care, defendant could have ascertained the dangerous condition of said excavation, hole or pit, but that they neglected the same and allowed it to remain open, unguarded, and with no warnings whatsoever."
But, assuming arguendo that the issue as to the existence of a dangerous condition is not raised by the pleading, Rule 1.15(b) 30 F.S.A., cures the defect.
"Rule 1.15(b) Amendments to Conform with the Evidence.  When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment or decree; but failure so to amend shall not effect the result of the trial of these issues. If the evidence is objected to at the trial on the ground that it is not within the issues made by the pleadings the court may allow the pleadings to be amended to conform with the evidence; and shall do so freely when the merits of the cause are more effectually presented thereby and the objecting party fails to satisfy the court that the admission of such evidence will prejudice him in maintaining his action or defense upon the merits."
See Robbins v. Grace, Fla.App. 1958, 103 So.2d 658, decided by this court, wherein the above rule is discussed. Suffice it to say, the record is replete with testimony offered by both sides on the issue of the existence of a dangerous condition.
*466 The appellant also assigns as error the failure of the lower court to grant its motion for mistrial after plaintiff's counsel had stated in the presence of the jury, "It's all right with me if you are going to inject insurance."
Mr. Schectman testified on direct examination that he paid the hospital bills. On cross-examination, the defense attorney asked if he did not make a claim to Blue Cross for reimbursement of certain expenses. Counsel for plaintiff objected and the court overruled the objection. Counsel for plaintiff then stated in the presence of the jury: "It's all right with me if you are going to inject insurance."
The defendant below contended that on cross-examination he sought to impeach the plaintiff by showing that he had not paid the hospital bill but that his insurance carrier, the Blue Cross, had paid it. The lower court overruled the plaintiff's objection to this question as technically this was a proper question on impeachment. The question did, however, bring to the attention of the jury that the plaintiff himself had not personally paid the hospital bill but that his insurance carrier had. This fact, nevertheless, could not be used by the defendant to reduce the plaintiff's damages. See Tampa Sand & Material Co. v. Johnson, Fla.App. 1958, 103 So.2d 250. We hold no brief for the plaintiff in making the comment he did about insurance, but cannot say there might not have been some justification in reply to the defendant mentioning insurance.
The court denied the motion to declare a mistrial and stated he would instruct the jury that they should not base their verdicts on whether or not there is insurance in the case. The court asked the appellant if it wanted the jury instructed and received the reply: "I do not want anything more said about it."
Under the facts in this case, we think the lower court was correct in refusing to declare a mistrial. See Lambert v. Higgins, Fla. 1953, 63 So.2d 631; Carls Markets v. Meyer, Fla. 1953, 69 So.2d 789; and Luster v. Moore, Fla. 1955, 78 So.2d 87.
Finding no error in the record, we affirm the lower court.
Affirmed.
WHITE, J., and SMITH, FRANK, Associate Judge, concur.